**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
**VAN E. JOHNSON**

        **Plaintiff,**


**VS.**

**LEND AMERICA**

        **Defendant.**
-----------------------------------------------------------X

VAN JOHNSON, the plaintiff herein, through is attorney Karamvir S. Dahiya of Dahiya Law Office LLC respectfully submit as follows:

1. The Plaintiff is an Afro-American presently residing at 128 Howard Avenue Brooklyn New York 11233.

2. Lend America, a corporation, the Defendant herein, is a mortgage lender operating from 201 Old Country Road, Melville New York 11747. Defendant, upon information and belief, operates through other branches and names too.

3. The Lend America had extended purchase money for Plaintiff 's residence and thus obtained mortgage security interest in said property bearing address 128 Howard Avenue Brooklyn New York 11233.

**JURISDICTION AND VENUE**

4. This is an action for violation of 42 U.S.C. §3601 *et seq*. (Fair Housing Act), 15 U.S.C. §1691 *et seq*. (Equal Credit Opportunity Act), 42 U.S.C. § 1981 *et seq*. (Civil Rights Act). Truth in Lending Act 15 U.S.C. 1601 et seq.

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. 133415 U.S.C. §1640(e).

6. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391 and §1408 because Defendant is a corporation subject to personal jurisdiction in this district, further the debtor is a resident of this District.

**FACTUAL ALLEGATION**

7. The ownership of a home is a fundamental bridge to financial security that has become an indispensable part of the "American Dream." It is the bedrock of economic security, as well as the primary vehicle by which families build wealth. Home equity accounts for more than one-third of the average net wealth of U.S. households.

8. During the last decade, African-Americans have joined Hispanic borrowers in helping to fuel a multiyear housing boom, accounting for 49% of the increase in home ownership from 1995 to 2005, according to Harvard's Joint Center for Housing Studies. Nonetheless, African-Americans are far more likely to have their American dream unduly burdened with subprime loans than their Caucasian counterparts.

9. Subprime loans are higher-cost mortgage products that are theoretically given to borrowers who have impaired credit. During the past 10 years, an entire "subprime" industry has been spawned by larger "profits" generated by the higher rates and exorbitant fees charged to "high risk" borrowers.

10. Unfortunately, the "subprime" industry has also attempted to maximize its profits by directing borrowers with relatively good credit to "subprime" mortgages. These predatory tactics have been disproportionately applied against members of the African-American community and other Minority Immigrants. The targets are easily persuaded to buy, borrow on very expensive loan terms, though they easily qualify for better loans with lower interest rates and fixed mortgages.

11. Upon information and belief, the majority of consumers who took out purchase mortgages from this lender, the defendant herein were put into higher-cost subprime loans compared with the Caucasians.

12. The defendant were usually targeting the minorities.

13. The defendant had their agents spread out in Queens and Brooklyn Area which are largely inhabited by minorities including the Afro-Americans.

14. While some borrowers in the subprime market are genuine credit risks, African-American and other minorities borrowers have been targeted and illegally steered into subprime loans. Defendant are reluctant or refuse to offer these borrowers the prime loans that are offered to Caucasian borrowers with the same qualifications. Instead, Defendant engage in predatory subprime lending, knowingly make loans with high loan-to-value ratios, in this case to borrowers who qualify for lower-cost or prime loans, in what amounts to a kind of "reverse redlining". Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive subprime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. This effectively dilutes the equity from the property, places the borrower in jeopardy of default, and puts the borrower in the position of spending years paying off additional loan balances without developing any equity.

15. In September 2005, the Federal Reserve Board concluded that African-Americans were more likely to pay higher prices for these mortgages. The United States Inspector General then cited that report as showing "significant" differences that made it "clear" that African-Americans were "much more likely to get higher-priced loans" than Caucasians, and the FDIC has stated that it does not believe that these significant disparities can be explained away by risk-based pricing, as the lending industry has repeatedly tried to do.

16. While long suspected, this discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their subprime home loans under the

Home Mortgage Disclosure Act. The non-profit Center for Responsible Lending performed a study using this data and a custom software program to analyze over 177,000 individual loans, culminating in May 31, 2006 report entitled "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages". This review combined self-reporting data form the lenders themselves under that Act, with a proprietary loan-level database that was able to account for and exclude specific risk profiles. Even after accounting for risks, clear disparities remained:

- On fixed-rate loans, African-Americans are 31% to 34% more likely to receive a higher-rate loan than if they had been Caucasian. Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African-American mortgagees.

- On adjustable-rate loans, African-Americans are up to 15% more likely to receive a higher-rate loan than if they had been Caucasian.

17. Van Johnson on January 24, 2006 was led by some agents of Lend America to their offices and was assured that he will get the best possible loan. However he was made to sign documents that were a product of discriminatory practices of Lend America.

18. These disparities can only be explained by race. Placing African-American and other minorities mortgagees into higher-priced subprime loans based on their race violates the Fair Housing Act, the Equal Credit Opportunity Act, and the Civil Rights Act. The violations entitle the plaintiff to relief provided under the Act, specifically declaratory and injunctive relief. This relief could include, but is not limited to, ordering Defendant to cease and desist from the unlawful conduct described above, and to modify the loans of the Plaintiff such as that lending practices would conform with statutory requirements; and this Court retaining jurisdiction on an ongoing basis in order to ensure and, where necessary, enforce its judgment.

## FIRST CAUSE OF ACTION
### (Fair Housing Act – 42 U.S.C. §3601 *et seq*.)

19. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

20. The Fair Housing Act, 42 U.S.C. §3601 *et seq*., was first enacted in 1968 to prohibit discrimination in connection with real estate transactions, including home purchases and refinancing. The Act has been broadly construed by the courts to make effective its provisions to protect consumers.

21. The Act prohibits mortgage lenders from imposing different terms or conditions on a loan, such as different interest rates, points or fees, on the basis of race. Defendant targeted African-Americans like Van Johnson and other minorities for higher cost subprime mortgage loans, while directing Caucasian applicants, with the same qualifications after accounting for risk, into lower cost loans.

22. In addition or in the alternative, under the guise of these purportedly facially-neutral subprime loan policies and practices, Defendant had a discriminatory effect and created statistical disparities so great between African-American and Caucasian mortgagees as to be functionally equivalent to intentional discrimination.

23. By the actions described above, Defendant have violated 42 U.S.C. §§3601, 3604, and 3605. Section 3605 states that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." Van Johnson is subjected to these discriminatory practices as alleged, and given loans on grossly unfavorable terms. Defendant continue to provide loans to other applicants with the same or similar qualifications, but on significantly more favorable terms. Therefore, as a proximate result of Defendant' systematic violation of this statute, Plaintiff is entitled to the requested relief provided under the Act.

24. Defendant continue to provide mortgage loans to Caucasian applicants with similar qualifications on significantly more favorable terms, and their policies and practices will continue to have a discriminatory impact in violation of the Act against people similarly situated like Van Johnsons in applications for a mortgage, as they have on minorities in the past. If not enjoined from such violations by the Court, Defendant will continue to engage in conduct that disregards the rights of minorities and causes irreparable injury.

25. Treating minorities members differently in mortgage lending based on their race violates this Act. As a proximate result of Defendant' systematic violation of this Act, Plaintiff is entitled to the requested relief requested herein.

## SECOND CAUSE OF ACTION
### (Equal Credit Opportunity Act – 15 U.S.C. §1691 *et seq*.)

26. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

27. The Equal Credit Opportunity Act was first enacted in 1974 as a consumer protection statute prohibiting discrimination in the issuing of credit. The Act has been broadly construed by the courts in order to make effective its provisions to protect consumers.

28. Defendant are creditors within the meaning of 15 U.S.C. § 1691(e). The mortgage loans offered to Van Johnson is a credit transactions. The Act provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race". 15 U.S.C. §1691(a)(1). People like Johnsons are systematically and continuously extended mortgage credit by Defendant on a discriminatory basis.

29. Defendant discriminated against Van Johnson on the basis of race in the terms and conditions of the loan contracts, including charging higher interest rates to African-Americans than similarly-qualified Caucasians, and will continue to engage in conduct that disregards the rights of other minorities members and causes irreparable injury if not enjoined from such violations by this Court.

30. Treating Van Johnson differently in mortgage lending based on their race violates this Act. As a proximate result of Defendant' systematic violation of this Act, Plaintiff is entitled to the requested relief requested herein.

## THIRD CAUSE OF ACTION
### (Civil Rights Act: Racial Discrimination 42 U.S.C. §§ 1981, 1982 *et seq*.)

31. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

32. The Civil Rights Act of 1866 and 1870, and later expanded upon through 1991, prohibits racial discrimination in the formation and issuance of contracts, and intentional interference to purchase and hold real property.

33. Defendant intentionally discriminated against Plaintiff and other minorities by charging them higher interest rates than those charged to similarly-situated Caucasian mortgagees.

34. By charging higher rates to the Class, Defendant unlawfully discriminated against Plaintiff in (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, and/or (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship, and in their right to purchase and hold real property.

35. Defendant' actions violate 42 U.S.C. §§ 1981 and 1982. As a proximate result of Defendant' systematic violation of this statute, Plaintiff is entitled to the requested relief provided under the Act.

## FOURTH CAUSE OF ACTION
**New York Deceptive acts and practices unlawful:
Section 349 of NY General Business Laws**

36. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

37. New York Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

38. The defendant is actively conducting business in New York state and thus subject to the foregoing Section 349 of NY General Business Laws. The defendant, while enticing the plaintiff with an excuse to get them the best possible loan, made them sign mortgage obligations that were not bargained for.

39. The defendant did not tell the plaintiff that he has a right to get an attorney of his choice and that he could get independent review of the documents, thus misled Plaintiff in making him sign an undeserving loan.

## FIFTH CAUSE OF ACTION
(Unjust Enrichment)

40. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

41. The Plaintiff had qualified for a fixed mortgage loan, however greed propelled the defendant to make fraudulently induce plaintiff to sign the loan documents. The defendant knew that they would make more money from an adjustable rate mortgage then a fixed one, though plaintiff qualified for a fixed rate mortgage and this results in unjust enrichment of the defendant.

42. The defendant is liable to disgorge to plaintiff the amount by which it has unjustly enriched through use of its loan agreement.

## SIXTH CAUSE OF ACTION
(Truth in Lending Act violations 11 USC §1601 et. Seq.)

43. Plaintiff incorporates each and every preceding paragraph stated above, inclusive, as though the same were fully set forth herein.

44. The purpose of the Truth in Lending Act (TILA) have been eloquently described as follows:

> The federal TILA, originally enacted in 1969 to attempt to resolve the problem arising in the burgeoning post-World War II consumer credit industry of overreaching of consumers by certain creditors by means of imposing unknown and often unkownble finance charge upon consumers . . . has been a congressional "success story.." The problem addressed by the Act was that, due to their leverage arising from production of adhesion contracts, the credit industry was imposing charges upon consumers of which consumers were ignorant . . . The theory of the TILA was that, by requiring creditors to inform consumers, in standardized disclosure terms, of the cost of credit, consumers would be enlightened about these terms and would be able to shop for credit. The philosophy of "let the buyer beware"

was, thus, per former Chief Justice, transformed into the philosophy of "the Let the Seller (or Lender) disclose."  (In re Russell, 72 BR 855 (Bankr. ED Pa 1987) citing Mourning v. Family Publication Service, 411  US 356, 364-65, 93 S. Ct. 1652, 36 L.Ed. 2d 318 (1973).

The Plaintiff herein was deprived of his right to know and decide; right to know and choose best possible product.  The defendant was not given a choice nor told about his options , thus the disclosure, unilaterally given by the defendant does not comport with the basic tenet of TILA and thus violates its provisions.

Plaintiff  hereby demands a trial by jury on all claims and issues which it has a right for a jury to render judgment if permissible under the Bankruptcy Code.

## PRAYER

WHEREFORE, Plaintiff, individually prays for entry of judgment as follows:

A. Entering judgment in favor of Plaintiff against Defendant;

B. Declaring that Defendant' practices, as described herein, violate the Fair Housing Act, the Equal Credit Opportunity Act, Truth in Lending Act and the Civil Rights Act and as well as New York General Business Laws.

C. Enjoining the complained of conduct and Ordering Defendant to modify their lending practices to comport with the law.

D. Ordering the defendant to modify the terms of loan to make it fixed interest mortgage as plaintiff was entitled at the time of purchase of house.

E. Plaintiff request that the Court exercise its equitable jurisdiction and order Defendant, their agents, subsidiaries, and affiliated companies to cease and desist from the unlawful conduct described above, and hereafter modify their lending practices to conform with statutory requirements.

F.  Plaintiff further request that the Court order Defendant their agents, subsidiaries, and affiliated companies to establish and publish informative materials and programs to fully inform African-Americans and other minorities about their rights to equal treatment with respect to home loans and subprime loans. Plaintiff further requests that the Court retain jurisdiction on an ongoing basis in order to ensure and, where necessary, enforce compliance.

G. Awarding attorney fees and costs to Plaintiff as allowed by law; and For such other relief as the Court deems just under the circumstances.

Dated:  December 9, 2008 Respectfully submitted,

        Sincerely,         */s/Karamvir s. dahiya*

        _____
        Karamvir S. Dahiya, for Van Johnson